**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| WELTHINE MONIQUE HODGE, | ) CASE NO. 1:24-CV-00059-CEH |
| | ) |
| Plaintiff, | ) JUDGE CARMEN E. HENDERSON |
| | ) UNITED STATES MAGISTRATE JUDGE |
| v. | ) |
| | ) MEMORANDUM OPINION & ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant, | ) |
| | ) |

**I. Introduction**

Plaintiff, Welthine Monique Hodge ("Hodge" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 11). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Plaintiff's Complaint.

**II. Procedural History**

On September 27, 2021, Claimant filed applications for DIB and SSI, alleging a disability onset date of June 1, 1998. (ECF No. 10, PageID #: 55). The applications were denied initially and upon reconsideration, and Hodge requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On November 22, 2022, an ALJ held a hearing, during which Hodge, represented by counsel, and an impartial vocational expert testified. (*Id.*). On January 4, 2023, the ALJ issued a written decision finding Claimant was not disabled. (*Id.* at PageID #: 55-71). The ALJ's

1

decision became final on November 20, 2023, when the Appeals Council declined further review. (*Id.* at PageID #: 39).

On January 10, 2024, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 12, 15, 16). Claimant asserts the following assignments of error:

1. The ALJ failed to support his RFC with substantial evidence when he applied the wrong standard of review by adopting the findings of the prior Administrative Law Judge.

2. The ALJ erred at Step Two of the Sequential Evaluation when he failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.

(ECF No. 12 at 1).

## III. Background

### A. Previous Disability Determination

On December 4, 1998, Claimant was found to be disabled beginning on January 1, 1997. (ECF No. 10, PageID#: 108). However, on March 3, 2016, it was determined that Claimant was no longer disabled as of March 1, 2016. (*Id.*). Claimant challenged this determination and, on July 29, 2019, an ALJ issued a written decision finding that Claimant's "disability ended on March 1, 2016, and the claimant has not become disabled again since that date." (*Id.*). In the July 2019 decision, the ALJ set forth the following residual functional capacity ("RFC"):

Based on the impairments present since March 1, 2016, the claimant has had the residual functional capacity to perform all exertional levels except never climb ladders, ropes, or scaffolds. The claimant should never be exposed to hazards, such as unprotected heights, dangerous machinery, and commercial driving. She is limited to performing simple, routine tasks. She can have occasional interaction with co-workers and the public. In addition, she is limited to routine workplace changes.

(*Id.* at PageID #: 113).

2

**B. Relevant Hearing Testimony**

The ALJ summarized the relevant testimony from Claimant's hearing:

The claimant testified that a combination of physical and mental impairments limit her ability to work. She testified that she has seizures at unpredictable intervals and described them as "falling out". She said that she is able to hear others during seizures but is unable to respond. She reported that after she has had a seizure, she feels very tired and must go rest. She testified that she has seizures as frequently as twice a week, but aside from the two that she had during the week of the hearing, she had not had a seizure for two months prior. As for her mental health impairments, the claimant testified that she worries about the possibility of having seizures and her anxiety escalates. She said she is able to follow instructions, but has difficulty talking to people and her concentration is impacted by her fear that she will have a seizure episode. (Hearing testimony).

(ECF No. 10, PageID #: 64).

**C. Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

The claimant was first diagnosed with a seizure disorder in February 2011. She describes her seizures as having a typical presentation of feeling like something warm is being poured over her and then having a loss of awareness. She reported when she was first diagnosed that a family member had witnessed a seizure and told her she looked like she was just staring. She said that she is typically unable to respond to questions during seizures and following them feels tired and might get a headache. (Exhibit B5F/56). An EEG support the diagnosis of focal epilepsy arising from the right frontal-temporal region, although new seizure activity was recorded. (*Id.*, 5).

The claimant reported at the Epilepsy Clinic at the Cleveland Clinic in January 2017 that she was having seizures approximately once every two months which lasted for less than a minute and resolved, leaving her tired. She denied any knowledge of a clear trigger for headaches. She reported having issues with depression and anxiety and said that she thought seizures worsened some difficulties she was having with short-term memory. (Exhibit B5F/17-18).

There is little evidence of follow-up treatment for her seizure disorder throughout the rest of 2017 and 2018. In fact, the next Epilepsy Clinic note in the record is from October 2019, when she saw her neurologist, Dileep Nair, MD. The claimant reported that she had last experienced a seizure about a month prior to the appointment. She reported that she had been in a grocery store when she experienced a staring episode and was unresponsive. Her provider increased her

3

dosage of Zonegran, and gave her seizure precautions, including not driving until released by a physician. Of note, this record mentions that the claimant stated she was driving a car. Dr. Nair also discussed with the claimant that she might be a candidate for epilepsy surgery but would need to have a video EEG monitoring beforehand. (Exhibit B5F/11-15). After this, there is another apparent gap in follow-up at the epilepsy treatment center.

The claimant saw a nurse practitioner at the Epilepsy Center on June 14, 2021. She said she was still having seizures, although she was unsure about how frequently they occurred. She reported she was sometimes missing her morning dose of medication and periodically missed both doses. She also admitted to having run out of her medication for four days. Notes for this encounter show that she had been offered surgical intervention and her last visit. The claimant said she had thought about it but did not want to pursue this option. She reported that she thought her seizures increased when she experienced stress after her mother died. (Exhibit B5F/7-8).

In September 2021, the claimant saw Ann McHugh, PA-C at the Epilepsy Center for a virtual visit. The claimant reported an increase in her medication compliance. She said that her seizures had decreased in frequency and only occurred monthly. She said that her last seizure had occurred in August 2021. Ms. McHugh increased the claimant's dosage of seizure medication and gave her a referral to psychology for processing her depressed mood following deaths of family members. She counseled her regarding seizure triggers to avoid and told her that she should not drive. (Exhibit B5F/4-6).

. . .

The claimant focused a great deal in her testimony on her seizure disorder as a source of psychological distress and identified fear of having seizures as causing many of her mental health symptoms. Specifically, she said that her seizure impairment contributes to limitations in interacting with others and going out into the community. However, records from Murtis Taylor show that the claimant was seen for impairments of bipolar disorder and PTSD. Well before 2019, the claimant was seeing Gary Wilkes, MD for psychiatric treatment at Murtis Taylor. His notes from March 2017 indicate that she was a patient of Murtis Taylor for at least five years and presented with depressed affect, said very little, and came in for refills even though she did not appear to be taking her medication regularly. (Exhibit B2F/54). At an appointment in June 2017, he encouraged the claimant consider counseling and described her as cooperative but withdrawn and "reclusive to her home." (Exhibit B6F/11). Dr. Wilkes continued to treat the claimant through May 2018. Documentation from his appointments from December 2017 and May 2018 show that the claimant reported compliance with Zoloft on a low dose and said it was helpful. He assessed her as being stable, although mental status observations continued to describe her as having constricted affect. (Exhibit B2F/24-28, 43-44).

4

A gap in mental health treatment records occurred after this, until the claimant presented at Murtis Taylor for evaluation on June 20, 2019. The claimant identified a concern about her disability benefits being cut off as her chief complaint. Clinical observations were that the claimant appeared tearful and made poor eye contact, but appeared to have logical thoughts and was fully oriented. She reported feeling overwhelmed, hopeless and helpless. She admitted that she had stopped taking her antidepressant medication due to sedation. The clinician who assessed her gave her a referral to a group therapy program and encouraged her to reconnect with case management services. (Exhibit B2F/2-9).

On September 10, 2019, the claimant saw a nurse practitioner. She was once again tearful and avoided eye contact. She complained of increased irritability and poor relationships with family members, poor concentration, increased anxiety as well as difficulties maintaining sleep at night and napping during the day. Mental status observations were that the claimant had impaired short-term memory, poor concentration, difficulty focusing, fair mood, logical thoughts, and full orientation. (Exhibit B6F/131-137). When she followed up a month later at Murtis Taylor, she admitted that she had not been taking psychotropic medication since October 2018, because she was "trying to wean off of them." She admitted to feeling symptoms of depression such as lethargy, sadness, irritability, and crying spells. She admitted to drinking and smoking marijuana on the weekends. The claimant asked for a prescription for psychotropic medication, and she was issued a prescription for Zoloft. (Id., 126-131).

At follow-up a month later at Murtis Taylor, in November 2019 the claimant reported a delay in starting Zoloft because it was on backorder, but said her symptoms were somewhat reduced. She reported having a little bit more energy and feeling more focused. She denied side effects from the medication. She also reported sleeping well. Mental status observations indicate that she had soft-spoken spontaneous speech, logical thoughts, good insight and judgment, full orientation, intact recent and remote memory, and inattentive demeanor. (Exhibit B6F/110-120).

At her next appointment in March 2020, the claimant admitted that she had run out of her psychotropic medications in December and had been busy, so she did not follow up to get prescriptions. She reported mild depression and anxiety "due to what's going on in the world." She stated that her sleep was "up and down." She said she was taking naps during the day because of interrupted sleep at night. Her provider noted that she presented with clear speech and depressed mood and appeared to have an average fund of knowledge, euthymic affect, intact memory, and full orientation. She was given another prescription for Zoloft. (Exhibit B6F/94- 95). A month later, when the claimant followed up, mental status observations were unremarkable with the exception of a notation that she had flat affect. She reported a decrease in anxiety since reinitiating Zoloft. She said she was doing well overall but was mildly depressed about being stuck at home

5

because of the pandemic. (Exhibit B6F/79-80).

At her next two appointments at Murtis Taylor with the nurse practitioner in June and October 2020, the claimant was found to have normal speech, logical thoughts, full orientation, intact recent and remote memory, good attention, and an average fund of knowledge. The claimant denied having significant feelings of depression or anxiety and reported medication compliance. (Exhibit B6F/49-65).

After this, the claimant saw Irene Shulga, MD at Murtis Taylor at regular intervals. At her appointment in December 2020, the claimant reported feeling sad because of a family member passing away but otherwise reported a stable mood. She said that sometimes her Zoloft caused her to "zone out." Dr. Shulga found the claimant to have spontaneous speech, linear and coherent thought processes, no paranoia or hallucinations, full orientation, intact attention span and concentration and an average fund of knowledge. (Exhibit B6F/34-35).

At her appointments with Dr. Shulga in March and June 2021, the claimant denied significant symptoms of depression and anxiety She said that sleep was not restful but she was not having nightmares. She reported independence in ADLs and occasional mood swings, irritability and restlessness. Mental status observations were unremarkable. (Exhibit B6F/24-31).

The claimant again reported that she was doing well when she saw Dr. Shulga on August 10, 2021, although she was sad because her mother had passed away. She said that her mood was stable and she was not experiencing any anger outbursts. She said that her sleep improved and she was sometimes taking melatonin. Mental status observations were that the claimant was fully oriented, behaved appropriately, and had coherent speech, euthymic mood, appropriate thoughts, normal psychomotor behavior, and fair judgment, insight and memory. (Exhibit B6F/19-20).

There was no change in the claimant's status when she had her next two visits with Dr. Shulga by telephone. She reported she was doing well, with a stable mood and adequate sleep and appetite. Mental status observations were unremarkable. (Exhibits B6F/12-15; B7F/4-5).

At her appointments with Dr. Shulga in May and July 2022, the claimant again denied significant anxiety or depression. She denied mood cycling and said she had a fair appetite. She reported being able to perform her ADLs. Mental status observations on both dates show that the claimant behaved appropriately, was fully oriented, and had euthymic mood, coherent speech, full orientation, and fair recent memory, judgment and insight. The note from the last appointment documented in the record in July 2022 describe the claimant as "calm and friendly." (Exhibit B9F/3-9).

(ECF No. 10, PageID #: 64-67).

**IV.     The ALJ's Decision**

At the outset of his decision, the ALJ explained that because the June 1, 1998 alleged onset date was "during a prior period of entitlement to benefits," Claimant's application was "an implied request to reopen the Title II portion" of the July 29, 2019 decision. (ECF No. 10, PageID #: 56). Because the ALJ concluded there was "no basis to reopen the decision for the continuing disability review, nor to re-evaluate the evidence prior to that date," he specified that the current decision addressed "the period of time beginning the day after the decision for the continuing disability review was issued, July 30, 2019, through the date of th[e] decision." (*Id.*).

The ALJ then made the following findings relevant to this appeal:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2023.

2. The claimant has not engaged in substantial gainful activity since July 30, 2019, the day after the decision for the continuing disability review of a prior period of entitlement. (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: epilepsy; affective disorder; bipolar disorder; depression; anxiety disorder; and posttraumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can never use ladders, ropes, or scaffolds and can occasionally balance. She is restricted from hazards such as heights or machinery but is able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles. She can ever be required to operate a motor vehicle during the course of the workday. The claimant is limited to simple tasks and to routine and repetitive tasks. She is limited to occasional interaction with coworkers and occasional superficial interaction with the public. Superficial is defined to mean if a member of the public were to approach and ask directions to the nearest restroom, she

would be able to provide such information but that would be the extent of the interaction.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 1998, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*Id.* at PageID #: 58-59, 61, 63, 69-70).

## V. Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial

evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises two issues on appeal, challenging 1) the ALJ's consideration of the RFC from the prior decision and 2) the ALJ's consideration of her headaches. (ECF No. 12 at 6-14).

### 1. The ALJ did not apply the wrong standard of review in considering the prior decision when formulating the RFC.

Claimant argues that the ALJ "applied the wrong standard or [sic] review" when he

"adopted the findings from the prior ALJ with only minor revisions" despite the current claim being for the period since the previous decision. (ECF No. 12 at 6). Citing *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018), Claimant argues that "[t]he law is clear that *res judicata* should not apply when an ALJ evaluates a subsequent application for benefits covering a distinct period of time." (*Id.* at 7). Claimant asserts that "there was new and material evidence that her impairments had worsened since she was no longer found disabled in March 2016." (*Id.* at 8). Claimant argues the evidence "warranted a different finding and greater physical and psychological limitations." (*Id.* at 9).

The Commissioner responds that the "ALJ's determination of Plaintiff's work-related functioning was consistent with agency policy and Sixth Circuit authority." (ECF No. 15 at 5). The Commissioner asserts that "the ALJ *did not adopt th[e] earlier findings*, and, regardless, he engaged in an in-depth review and analysis of new evidence related to Plaintiff's current claim period consistent with *Early*." (*Id.* at 6). Pointing out that "the ALJ deviated from Plaintiff's 2019 RFC by adding a limitation to only occasional balancing and further limiting Plaintiff to superficial interaction with the public and only repetitive tasks," the Commissioner argues that "Plaintiff's suggestion that the ALJ erred by adopting her previous RFC should be rejected." (*Id.*).

Claimant replies that "[t]he new and material evidence . . . presented additional limitations which were not considered by the ALJ" and "the medical evidence documented a worsening of her symptoms since the time when she was found no longer disabled." (ECF No. 16 at 1).

In *Earley*, the Sixth Circuit rejected the idea that an ALJ is always bound by a previous disability determination and recognized that "[a]n individual may file a second application—for

a new period of time—for all manner of reasons and obtain independent review of it so long as the claimant presents evidence of a change in condition or satisfies a new regulatory threshold." 893 F.3d at 932. However, the *Earley* court noted that "[f]resh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.

Considering the decision as a whole, the Court finds that the ALJ provided the "fresh review" required by *Earley*. As the Commissioner argues, the ALJ did not adopt the earlier RFC without changes. Rather, when considering the medical opinions, the ALJ noted that the State agency physicians' RFC was "an adoption of the [RFC] from the [ALJ] decision of July 29, 2019" and explained that the RFC finding was "persuasive, and adequately consider[ed] the limitations imposed by the claimant's epilepsy." (ECF No. 10, PageID #: 68). However, the ALJ "added a limitation to no more than occasional balancing to the [RFC]." (*Id.*). Turning to the State agency psychological consultants' opinions, the ALJ noted that the consultants "did not adopt the findings from the [July 2019 decision] because of new and material evidence." (*Id.*). While the consultants "found that the claimant's mental impairments impose no more than mild limitation in any area of functioning," the ALJ found their opinions "not fully persuasive" because they "did not take into account the claimant's subjective distress, and mental health treatment records, which document depressive symptoms, sleep difficulties, and self-isolation." (*Id.*). The ALJ expressly indicated that he did not adopt the prior RFC because "[a]lthough the treatment records reflect little change in the claimant's impairments, they do support an additional limitation that the claimant can only occasionally balance." (*Id.*). The ALJ further indicated that "the mental limitations in the [RFC] have been reworded to limit the nature of the claimant's interaction with the public to 'superficial.'" (*Id.*).

This discussion of the State agency opinions shows that while the ALJ considered the prior RFC, he only adopted the portions he found persuasive based on the *new* medical records. The ALJ provided a detailed discussion of the medical evidence, focusing on the evidence from after the July 2019 decision. (*See* ECF No. 10, PageID #: 65-67). The ALJ noted that there was "little evidence of follow-up treatment for [Claimant]'s seizure disorder" from January 2017 until October 2019, when Claimant reported that she experienced a seizure about a month earlier. (*Id.* at PageID #: 65; *see id.* at PageID #: 443). There was another gap in treatment until June 2021, when Claimant reported "she was still having seizures, although she was unsure about how frequently they occurred" and was not taking her medication as prescribed. (*Id.* at PageID #: 65; *see id.* at PageID #: 439). In September 2021, Claimant "reported an increase in her medication compliance" and "her seizures had decreased in frequency and only occurred monthly." (*Id.* at PageID #: 65; *see id.* at PageID #: 436-37). The ALJ also discussed Claimant's mental health treatment since the previous decision, indicating that the records show that Claimant "herself identified stress as a possible contributor to her seizures and also experienced anxiety about the possibility of having a seizure in public" and she has "some difficulty resolving problems in getting along with others as well as a tendency to self-isolate." (*Id.* at PageID #: 67-68).

Thus, the ALJ complied with the requirement that he give a "fresh look to a new application containing new evidence" when formulating the RFC. Substantial evidence supports the ALJ's decision. As such, the Court must defer to the ALJ's decision, "even if there is substantial evidence that would have supported an opposite conclusion." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

### 2.  The ALJ properly considered Claimant's headaches.

Claimant's second argument challenges the ALJ's consideration of her headaches. She

argues that the "ALJ erred when he failed to discuss [her] headaches even though a number of neurology records mentioned headaches" and "continued by incorrectly finding that the records were insufficient to establish a primary headache impairment." (ECF No. 12 at 10). Claimant argues that the "ALJ also erred in his analysis of [her] headaches in relation to Rule 19-4p," which "deals with all types of primary headaches in conjunction with Listing 11.02," and asserts that she "should have been found disabled at Step Three of the sequential Evaluation." (*Id.* at 11). Even if the ALJ's listing determination was supported, Claimant argues that the ALJ erred in crafting the RFC because he "failed to discuss any effects the headaches would have on her ability to engage in substantial gainful activity on a full-time and sustained basis." (*Id.* at 13).

The Commissioner responds that the ALJ did not err in considering Claimant's headaches. The Commissioner asserts that Claimant "has not met her burden to show that the ALJ should have treated her headaches as MDIs at Step Two or thereafter of the sequential analysis" because "she fails to ever identify any acceptable medical source who allegedly diagnosed her with primary headache disorder" as required by SSR 19-4p. (ECF No. 15 at 8-9). The Commissioner argues that because Claimant "failed to carry her burden to show she had the MDI of primary headache disorder she cannot demonstrate the ALJ erred in not discussing Listing 11.02" and Claimant has otherwise "made no attempt to show she met or equaled Listing 11.02B, and, accordingly, has waived that argument." (*Id.* at 9). As to the failure to include limitations in the RFC, the Commissioner argues that "Plaintiff has not identified any statements from medical professionals indicating that her headaches caused functional limitations." (*Id.*).

Contrary to Claimant's argument that the ALJ "failed to discuss Plaintiff's headaches," the ALJ explicitly discussed Claimant's headaches and explained why such were not a severe impairment:

Additionally, a number of the neurology treatment records mentioned that the claimant has headaches, sometimes independent of seizures and often at the time seizures occur. (Exhibit B5F/5, 11, 13-14, 17-18, 27, 29, 38). In fact, the claimant was treated for a headache impairment with nortriptyline and Zomig well before the period of time under consideration, in April 2007. (*Id.*, 62). However, these records do not indicate a diagnosis of a primary headache impairment after July 2019 except for the claimant's self-report of having migraines.

These records are insufficient to establish that the claimant has a primary headache impairment. Under Social Security Administration rules for evaluating allegations of a headache impairment, we find that the claimant has a primary headache disorder when there is evidence establishing chronic headaches such as migraines, tension-type headaches and trigeminal autonomic cephalgias. Primary headache impairments are typically severe enough to require prescribed medication and often warrant emergency department visits. Primary headache impairments are diagnosed by ruling out other medical conditions that may cause the symptoms and through a careful examination of the reported symptoms, frequency of headache activity, and the quality and nature of pain. We establish a primary headache disorder as a medically determinable impairment by considering objective medical evidence, which must include a primary headache disorder diagnosis from an acceptable medical source, documented observation of a typical headache event, with a detailed description of the event and all associated phenomena, laboratory testing or imaging, and documentation of the individual's response to treatment. (SSR 19-4p). In this case, the evidence above does not contain these elements. Therefore, while the claimant does have headaches associated with her seizure disorder, and possibly occasional headaches not related to any other impairment, the record does not establish a primary headache impairment.

(ECF No. 10, PageID #: 59-60). The records cited by the ALJ include reports by Claimant in September 2021 that she had suffered from migraines for years, consisting of "pain in her temple and eyes" as well as "pounding with photophobia and phonophobia," and lasting all day. (*Id.* at PageID #: 437). Claimant cites this same record to support that a "neurologist found that her headache consisted of pain in her temple and eyes, pounding with photophobia and phonophobia." (ECF No. 12 at 10-11). But, as the ALJ noted, "these records do not indicate a *diagnosis* of a primary headache impairment after July 2019 except for the claimant's self-report of having migraines." (ECF No. 10, PageID #: 59 (emphasis added)). Thus, the ALJ determined that Claimant's headaches were not a medically determinable impairment. Substantial evidence

supports this decision.

Claimant's argument concerning the ALJ's listing analysis also fails. Because the ALJ reasonably concluded that Claimant's headaches were not a severe impairment, he did not err in failing to consider whether Claimant's headaches equaled a listing. *See Robinson v. Comm'r of Soc. Sec.*, No. 13-CV-11637, 2014 WL 3528434, at *13 (E.D. Mich. July 16, 2014) ("[B]ecause the ALJ found that plaintiff's HIV and depression were not severe impairments at Step Two, she was not required to perform a Step Three analysis of those impairments.") (collecting cases). Further, Claimant has not carried her burden of showing that her headaches equaled Listing 11.02. Claimant cites record evidence describing her complaints of headaches at medical appointments. (*See* ECF No. 1, PageID #: 437, 443, 622). But these subjective complaints do not amount to "a statement from an acceptable medical source that complies with SSR 19-4p, i.e., one that provides a detailed description of a typical migraine event, the side effects of her medications, and, most importantly, an opinion concerning the limitations in functioning associated with her migraines." *Snyder v. Comm'r of Soc. Sec.*, No. 22-5948, 2023 WL 3673265, at *4 (6th Cir. May 26, 2023). Thus, the ALJ did not err by not considering Claimant's headaches at step three.

Finally, Claimant's argument that the ALJ erred in failing to include additional limitations based on her headaches is unavailing. While Claimant asserts that her "headaches resulted in an inability to work at least once a week," she wholly fails to point to evidence beyond her own subjective complaints to support that additional limitations were warranted. (ECF No. 12 at 10-13). As such, Claimant has not shown that additional limitations in the RFC were warranted.

Accordingly, the ALJ did not err in his consideration of Claimant's headaches.

15

**VI. Conclusion**

Based on the foregoing, the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying to Plaintiff benefits. Plaintiff's Complaint is DISMISSED.

Dated: July 23, 2024

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE